IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No.: 8:22-CR-332 |
| PABLO GARCES CAMUS, SHANE PAUL CAMUS, | |
| Defendants. | |

**REDACTED TRANSCRIPT**
**SENTENCING PROCEEDINGS**
**BEFORE THE HONORABLE VIRGINIA M. HERNANDEZ COVINGTON**
**UNITED STATES SENIOR DISTRICT JUDGE**

**March 7, 2024**
**10:08 a.m. to 3:34 p.m.**

**APPEARANCES:**

**FOR THE PLAINTIFF:**
CHARLES D. STRAUSS, ESQUIRE
Department of Justice
Criminal Division
1400 New York Avenue Northwest
8th Floor
Washington, DC 20005

**FOR THE DEFENDANT: (PABLO CAMUS)**
RICHARD A. MERLINO, JR., ESQUIRE
Richard A. Merlino
101 NE 3rd Avenue
Suite 1500
Fort Lauderdale, Florida 33301

**FOR THE DEFENDANT: (SHANE CAMUS)**
MICHAEL J. ENTIN, ESQUIRE
Michael J. Entin, PA
101 Northeast 3rd Avenue
Suite 1500
Fort Lauderdale, Florida 33301

**ALSO PRESENT:**
PABLO GARCES CAMUS, DEFENDANT
SHANE PAUL CAMUS, DEFENDANT

(Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.)

**REPORTED BY:**

Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813) 301-5380 | r.lockwooduscr@gmail.com
801 North Florida Avenue, Tampa, Florida 33602

INDEX


| DEFENDANT PABLO CAMUS'S WITNESSES | PAGE |
|---|---|
| Statement of Robin Camus | 52 |
| **DEFENDANT SHANE CAMUS'S WITNESSES** | **PAGE** |
| Statement of Maria Rodriguez Lewis | 66 |
| Statement of Emily Lewis | 68 |

(Call to Order of the Court at 10:08 a.m.)

**THE COURT:** Good morning, everybody. The AUSA is not here. He just had the wrong time.

**THE COURTROOM DEPUTY:** He's going to be here at 10:15.

**THE COURT:** All right. So, apparently, the assistant U.S. Attorney had the wrong time on his calendar. So we'll just wait for him. Everybody can be seated, and we'll wait for him.

**MR. ENTIN:** My client went to the restroom, as well, Your Honor.

**THE COURT:** I'm sorry?

**MR. ENTIN:** My client went to the restroom.

**THE COURT:** That's fine. No problem.

(Discussion off the record.)

**THE COURT:** Good morning. We're here for the sentencing in United States v. Pablo Garces Camus and Shane Paul Camus, Case 22-332.

I'll begin by having Counsel state their appearances.

Who do we have for the government?

**MR. STRAUSS:** Your Honor, Charles Strauss for the United States.

**THE COURT:** All right. Thank you. Who do we have for Pablo Camus?

**MR. MERLINO:** Good morning, Your Honor. Richard

Merlino on behalf of Pablo Camus. He's seated --

**THE COURT:** I'm sorry. How do you pronounce the last name?

**MR. MERLINO:** C-a-m-u-s, Camus.

**THE COURT:** Camus. Okay. Camus.

And for Shane Paul Camus, who do we have?

**MR. ENTIN:** Good morning, Your Honor. I'm Michael Entin, E-n-t-i-n, on behalf of Shane Camus, who is present on my right.

**THE COURT:** Okay. All right. Thank you very much.

We have Ms. Campbell from probation.

I'm going to sentence both defendants at the same time. So I'll read both sentencing statements at the same time. So just bear with me as I go back and forth.

Paul -- I'm sorry, Pablo Garces Camus and Shane Paul Camus, on October 27th, 2022, you entered a plea of guilty to Count 1 of the information, charging you with conspiracy to commit health-care fraud, in violation of Title 18 United States Code Sections 1347 and 1349.

The Court previously accepted your guilty plea and has adjudged you guilty of that offense.

We have now reached the stage in the proceedings where it is my duty to address several questions to you and your attorney and the counsel for the government.

Mr. Strauss, do you have -- as to both defendants, do

you have any objections to the factual accuracy or to the probation officer's application of the Guidelines, as to both defendants.

**MR. STRAUSS:** No, Your Honor.

**THE COURT:** Okay. Thank you.

Mr. Merlino, I'll start with you. With respect to Pablo Camus, have you had the opportunity to read and discuss with Mr. Camus the presentence report?

**MR. MERLINO:** Yes, Your Honor.

**THE COURT:** Do you have any objections as to the factual accuracy of the report?

**MR. MERLINO:** We do not, Judge.

**THE COURT:** Do you wish to make any objections to the probation officer's application of the Guidelines?

**MR. MERLINO:** No, Judge.

**THE COURT:** Okay. Thank you very much.

I'll turn to Mr. Entin with respect to Shane Camus. Mr. Entin, have you had the opportunity to read and discuss with Mr. Camus the presentence report?

**MR. ENTIN:** Yes, we have.

**THE COURT:** All right. Do you have any objections as to the factual accuracy of the report?

**MR. ENTIN:** No.

**THE COURT:** Do you wish to make any objections to the probation officer's application of the Guidelines?

**MR. ENTIN:** No.

**THE COURT:** All right. Thank you. As to both defendants, there being no objections to the factual statements and Guideline calculations contained in the presentence report, the Court adopts those statements as its findings of fact and determines that the advisory Guidelines are -- and they are the same for both defendants -- total offense level 30, criminal history category I, 97 months to 120 months' imprisonment, one year to three years' supervised release, $6,799,581.52 in restitution, 30,000- to a 250,000-dollar fine, and a 100-dollar special assessment.

All right. Mr. Strauss, are there any victim representatives, government victim representatives that wish to make a statement through you or any victim representatives that are present in the courtroom that you're aware of?

**MR. STRAUSS:** No, Your Honor.

**THE COURT:** Okay. So we will move forward then.

Mr. Strauss, do you know of any reason why this Court should not now proceed with imposition of sentence?

**MR. STRAUSS:** No, Your Honor.

**THE COURT:** This is your opportunity to make a statement with respect to what an appropriate sentence -- you can tell me as to both defendants, what you think an appropriate sentence for both defendants would be. We're still having a little bit of audio problem. Do you think it's better

if he comes to the podium, Magaly? Do you think that would be better?

**THE COURTROOM DEPUTY:** Yes, Your Honor.

**THE COURT:** Why don't you come to the podium, Mr. Strauss, so that we can all hear you up here.

**MR. STRAUSS:** Yes, Your Honor.

Your Honor, pursuant to the defendant's plea agreement with the government, we would request a bottom of the Guideline sentence as to both defendants.

**THE COURT:** Let me ask you something. So the amount of the loss -- the restitution is $6,799,581.52 to Medicare. Remind me what you believe your investigation showed each defendant actually financially gained as a result of their illegal activity. Let's just start with that.

What did Pablo Camus financially gain, he himself?

**MR. STRAUSS:** I believe, Your Honor, and I looked at that again this morning, it was 4 million for Pablo, the father, approximately 2 million for the son, and then the third defendant was around six or 700,000, and that was Mr. Espinoza.

**THE COURT:** So the father received $4 million. Have you traced that money? Where is that money? Where did that money end up?

**MR. STRAUSS:** Your Honor, I personally do not know. I do have some agents that worked on the case in the room that I could inquire that specific question of. But I have not

looked at the tracing of that money.

**THE COURT:** Well, did you not -- did you try to file forfeiture actions or anything like that?

**MR. STRAUSS:** Yes, Your Honor. I believe --

**THE COURT:** Because I saw with the son, there was a resolution, and money was turned into the asset forfeiture fund in lieu of -- in lieu of the house, I think is what it was when I looked at this yesterday. I think that's what it was.

For the father, though, I wasn't certain -- I'll get to you in just a second. Let me just hear from the prosecutor first.

**MR. STRAUSS:** Yes, ma'am.

**THE COURT:** From the father, though, I wasn't absolutely certain. What do you have with respect to the father from the prosecutor's perspective? The defense attorney wishes to say something, but I'll get to him in a few moments.

What do you have?

**MR. STRAUSS:** Your Honor, I apologize for not having a better answer for you. My understanding was that that side of the investigation was handled by Mr. Muench through the U.S. Attorney's Office, and the appropriate filings and orders were made related to the restitution. However, you know, in terms of personally tracing those assets, I did not participate in that part of the investigation, but I'm happy to inquire for the Court.

**THE COURT:** Well, I would look to you as the person who's here in front of me as the prosecutor.

**MR. STRAUSS:** I understand, Your Honor.

**THE COURT:** I'll tell you why I ask that, because I do consider what restitution has been made, Mr. Strauss. You're asking the bottom of the Guidelines, which is, you know, pretty standard in these cases.

Let me ask you, this gentleman pled to an information. Originally, what were -- what was the government looking at in terms of potential charges?

**MR. STRAUSS:** Well, Your Honor, it would -- essentially, there was a conspiracy to commit health-care fraud. There were many substantive instances of health-care fraud for the DMEs. I mean, you know, technically speaking, each separate DME could be a sale or thought it could be a separate charge. There was also the kickbacks charges, both the conspiracy under 371 and the actual kickbacks --

**THE COURT:** I guess -- let me just phrase it differently. I guess I'm looking to see what range of punishment he was able to walk away from, so to speak, by pleading to an information as opposed to an indictment.

In other words, can you tell me the difference in sentences that the gentleman was looking at?

**MR. STRAUSS:** Your Honor, versus, you know, the 20-year max?

**THE COURT:** Sorry. Can you speak into the microphone? I'm so sorry. I can barely hear. Go ahead.

**MR. STRAUSS:** Your Honor, he could have faced up to a 20-year maximum on the health-care fraud versus the current ten-year cap, statutory cap that he faces under the information, if that's --

**THE COURT:** And I realize -- sorry. Not to jump in there. I realize now that that preliminary forfeiture was as to -- for some reason, when I looked at this yesterday, I thought it was as to the son, but it's as to the father.

Is that what you were going to say, Mr. Merlino?

**MR. MERLINO:** It was, Judge. I have the order here.

**THE COURT:** Yeah, I do see that. I must have misread this yesterday.

**MR. MERLINO:** Similar situation with the residence, Judge. We have paid 50,000.

**THE COURT:** What I'd like to know -- thank you, Mr. Merlino.

What I'd like to know from Mr. Strauss is, are you able to tell me how much money has been turned into the United States to help offset -- this is a $6 million. And he -- you say he received personally $4 million? That seems awfully high, and to not know where that money is today. You sure it's 4 million? It's normally nowhere as high as that.

**MR. STRAUSS:** Your Honor, if I'm accidentally

confusing the figures as to the group versus Mr. Camus himself, I apologize. I'm slightly rattled at the moment. But if I could just have a moment to return to my notes, and I would gladly get you that answer right now. I just don't want to say anything on the record that's --

**THE COURT:** But that's one of the factors that I use in terms of trying to come up with an appropriate sentence. Not so much the restitution, because you're jointly and severally liable for what everybody else has done.

So the total loss is, you know, 6,799,000. What did each defendant personally gain? Four million seems like a lot. And not be able to attach that money today or somehow be able to get that $4 million back -- Mr. Strauss, I'm going so ask you to sit down for a moment. Let me see if Mr. Merlino is able to enlighten me on this.

Mr. Merlino, do you know what the total -- what the loss attributed to your client is?

**MR. MERLINO:** Out of the actual loss, Judge, that was -- I hate these little pocketed --

**THE COURT:** What he personally benefited.

**MR. MERLINO:** Right. What -- and I've handled a number of these cases over the last four years within Operation Brace Yourself. And what is customary -- and then I'll get to Mr. Camus in particular in just a moment. It's a very expensive endeavor. These are multilevel -- or multifaceted

businesses with marketing, with billers, with the brick-and-mortar employees, what have you. Most of what I understand -- it's one of the first questions I ask when I came on this case four years ago, was what Your Honor is getting to, because we want to know what losses we're dealing with to see where we're starting out with the government.

And the lion's share of that, and I don't have any breakdown or the ability to audit from the beginning, because that paperwork is not kept, was reinvested in that particular business.

And there were a number of entities, as you know, from the offense conduct that were involved. Most of that did not go into his personal accounts whatsoever. He drives a modest car. So does his wife. They live in a modest home in South Florida. We're not talking about point lots in the Intracoastal in Fort Lauderdale with a yacht and Lamborghini. That's not what they profited out of this.

**THE COURT:** So, Mr. Merlino, he did, I'll just say, obtain $4 million. But what you're telling me is that money went into the business?

**MR. MERLINO:** Yes. It was reinvested in the business for growth and diversification. And a number of entities were started up. There were instances during the relevant period of this conduct before the government got involved that DMEs were started and then sold.

**THE COURT:** Okay. How much has he paid the government, even -- either from substitute assets, forfeited assets. First of all, what were the forfeiture actions that were filed. I see that several of them --

**MR. MERLINO:** I was dealing with Mr. Muench on this.

Similar situation with his son, Shane. They look toward the equity in the house. There was an appraisal given. 50,000 in liquid was removed and forwarded to the government. And then we came up with an amended order that was -- that vacated the preliminary order of forfeiture for substitute asset. And that was to be done before sentencing.

**THE COURT:** Right. So how much has he paid, 50,000?

**MR. MERLINO:** $50,000.

**THE COURT:** So you see why I look at this, Mr. Merlino. I mean, you know, the government could have moved forward with that forfeiture as a substitute asset. They have every right to do that. You know, but it's normally better to reach an agreement, if you're able to do it. But it's still, you know, for better, for worse, all these other reasons that you've set forth, I understand.

**MR. MERLINO:** I have one other, too. I don't mean to interrupt.

**THE COURT:** Oh, okay. So what else -- yeah, I was trying to get to all of them.

**MR. MERLINO:** It's the crux of one of the glaring

issues that is before us. It's substantial assistance. In this case --

**THE COURT:** Okay. But we're not -- I'm not -- the only reason I called you up here, is because, honestly, I couldn't get the answer from the prosecutor that I needed. We're not at sentencing yet.

**MR. MERLINO:** No, no, no.

**THE COURT:** We're nowhere close to it.

**MR. MERLINO:** If it seems that the government has been lenient, if I want to use that word, at this juncture on the forfeiture side of it, they've been given a lot of credence with respect to how much money they've actually brought back to the government in restitution, forfeiture actions with other investigations, prosecutions, and convictions.

**THE COURT:** But it's $50,000.

**MR. MERLINO:** Yes, I understand.

**THE COURT:** Which is --

**MR. MERLINO:** When you compare that to 4 million, it's a drop in the bucket.

**THE COURT:** That's right. And it's also my experience that if the money is not turned over at the time of sentencing, it's very hard to get the money, unless there's a forfeiture action pending, a lis pendens, and so that, to me, is a really important component at sentencing. That's why I was trying to get to the bottom of it. All right. So $50,000.

All right.

Let me -- while I'm at this, let me ask Mr. Entin, with respect to your client, and I know it says $2 million is what your client -- the loss attributed to your client. And I imagine you would say that that went back into the business as well. How much has your client turned over to the government?

**MR. ENTIN:** My client received, I think, in the end, approximately $400,000, if you track the money. There was --

**THE COURT:** So it was 2 million.

**MR. ENTIN:** Two million went into the businesses that he was working with others. His net amount he received would be roughly $400,000. We filled out a financial affidavit. We revealed all of our assets to the government, Mr. Muench. And we provided money that was also borrowed from family members to collect as much as we could, and they've exhausted everything they have. And they paid $230,000 back to the government.

**THE COURT:** Well, that's -- that's a substantial amount. I'm going to assume that that 400,000-dollar figure is something that you worked out, that you resolved with the government. Is that right? Were they in agreement with that?

**MR. ENTIN:** Well, I don't -- no, they never --

**THE COURT:** That's your own figure.

**MR. ENTIN:** I'm just telling you I think that's what the paper trail shows. This thing started five years ago. So we came forward five years ago with our financial situation.

**THE COURT:** Okay. 230,000 -- and I think that's why I was a little bit not as clear as I could have been initially -- that is a substantial amount of money, particularly for a younger person to pay. So that's particularly impressive that he's paid 230. Now, true, it's a 2-million-dollar attributed to him. But it's still a fair amount of money.

**MR. ENTIN:** If you look at his assets, he's in the negative at this point.

**THE COURT:** I know. I know. But they normally are at this point in a negative.

When they get into sentencing, normally, all the money has gone to somebody else. It's out the door. So I understand that.

**MR. ENTIN:** Okay. Thank you.

**THE COURT:** Thank you, Mr. Entin.

All right. Mr. Strauss, I'm going to come back to you, now that I have this information. So, Mr. Strauss, you can tell me what sentence you're looking at. You're looking at the bottom of the Guidelines? I think that's what you said earlier. Is that right?

**MR. STRAUSS:** Yes, Your Honor. As to both defendants. You know, I will -- you know, I know we're not to the particular, you know, potentially mitigation, but I do just want to be up front --

**THE COURT:** Oh, well, you can tell me if you think they deserve less, by all means, let me know.

**MR. STRAUSS:** We're sticking with our recommendation of a bottom-of-the-Guideline sentence at this time.

[redacted]

[redacted]

**THE COURT:** [redacted]

**MR. STRAUSS:** [redacted]

**THE COURT:** [redacted]

[redacted]

**MR. STRAUSS:** [redacted]

[redacted]

[redacted]

[redacted]

**THE COURT:** [redacted]

[redacted]

**MR. STRAUSS:** Your Honor, just as this -- you know, this was a widespread and rampant and very involved business on behalf of both Pablo and Shane. And notwithstanding, you know, the mitigating factors that each of them have, [redacted], but in regards to Shane Camus's -- excuse me for using first names, it's just to differentiate them, Your Honor --

**THE COURT:** It's okay.

**MR. STRAUSS:** -- upbringing and in terms of being brought in by his father, they were both sophisticated in their means of carrying this out, and, you know, had independent roles of each other, and that a bottom of the Guideline sentence would sufficiently deter conduct and would meet the

other 3553(a) factors as this time. [redacted]

**THE COURT:** Yeah. I think it's probably at least, I prefer that if the sentencing has to be moved to do that, [redacted] Honestly, I think it's better to -- generally speaking, to move to continue the sentencing.

**MR. ENTIN:** Judge.

**THE COURT:** Uh-huh.

**MR. ENTIN:** [redacted]

I would ask, and I would advocate that you continue the sentencing so that you can get the true picture.

**THE COURT:** Yeah. And, Mr. Strauss, I mean, you've come in here -- I have to tell you, you know, I had to get the answers to some of these questions that are really government questions from the defense. I think if you can get that information for me -- I mean, this is somebody who thinks what

you -- when you owe money to the government, what you've paid back is really important.

**MR. STRAUSS:** Yes, Your Honor.

**THE COURT:** Really, really important. And, you know, I understand what Mr. Merlino is saying, it went into the business. The business failed, but it's still money that you took. It's still money that you're accountable for. And I want to know what you have given back -- you know, you, generically -- have given back to the government, what you sacrificed.

I mean, I've had defendants in here who have -- their families have sacrificed everything. And I don't view it as -- at all as pay to get out of jail. I know there are some people who view it that way. I don't. Because if somebody took money from me, what I would least care about is how much time they spent in jail. What I would care most about is how much of my money have you given back to me. So that, to me, is really important. And that's why I started out with that.

And it's, you know, well, you gotta talk to Mr. Muench. It's really not the answer I was looking for at all, particularly when, you know, government paid for you -- you're not out of Tampa, are you? You're out of Washington.

**MR. STRAUSS:** I do live here, Your Honor.

**THE COURT:** Pardon me?

**MR. STRAUSS:** I live here, Your Honor.

**THE COURT:** You work for the Department of Justice in Washington, DC.

**MR. STRAUSS:** Yes.

**THE COURT:** All right. So you live here in Tampa with -- okay. So nobody paid for you to travel here.

But, still, you're representing the Department of Justice. And those are -- you know, as I said earlier, important position. And I, you know, really felt like I've been hamstrung with the lack of information.

What's wrong with continuing the sentencing? [redacted]

**MR. STRAUSS:** Thirteen months, Your Honor. I think that was the hesitation is that Your Honor had originally set this for early last year. I've had cases go for quite some time, both in many districts that I've worked in. I've never had one go that long. I felt -- you know, I believe that was a big ask of any Court. But if Your Honor is open to it, we have no objection to that. We just saw how long it had already been pending. And for another -- to ask you for another 13 months, if it was another 60 days, we would have filed a continuance. But it's a big ask, and Your Honor --

**THE COURT:** Well, those are things to tell the Court not the day of sentencing, Mr. Strauss. Not the day -- like, you know, I'm confronted with the other sentencing. The day of

sentencing, to do something like that? It's like what's going on here? I mean, you can understand why I wasn't, you know, with a big smile on my face when you walked in here, honestly.

**MR. STRAUSS:** Your Honor, I --

**THE COURT:** It's like the one-two punch. It's the one-two punch here.

**MR. STRAUSS:** And, Your Honor, I'm the only person you should be mad at for that.

**THE COURT:** Yeah. Well, I am. Disappointed.

**MR. STRAUSS:** I understand, Your Honor.

**THE COURT:** All right. So 13 months. I mean, 13 months is a long time.

**MR. ENTIN:** Can I suggest that we set a status?

**THE COURT:** No. I'm not doing a status. I'm either going -- and I don't have time -- I'm not -- I don't have time right now, because of the time that we lost earlier.

What I think -- this is what I think I'm going to do. It's a quarter to 11. And I have to be out the door by 11. I can be back here at 1:30ish. I'm going to give you the opportunity -- I'm going to -- I'm going to recess the sentencing. And, you know, I'm sorry if you've had to -- you know, your travel plans have been thrown amok here, but I'd rather, you know, get it right and have you be -- give you the opportunity to talk to one another. I'm not real wild about waiting 13 months to sentence somebody. That really is an

awfully long time. And you're hitting me with this for the first time at sentencing.

I mean, did -- you know, this would be the kind of thing that -- had you told me that before, did I just miss it?

**MR. STRAUSS:** No, Your Honor. We just did not -- and I still did not anticipate ever asking the Court for 13 months. Now, we were going to jointly ask for a, you know, self-surrender date at some point.

**THE COURT:** I don't have any problem with a self-surrender date.

**MR. STRAUSS:** And that's --

**THE COURT:** You know, let me just think outside the box here. I mean, the other option is, because I'm sure what the defense is looking for is, they're going to try to get the sentence down -- I don't know with this Guideline range is still fairly substantial, where it's still -- they're looking at 78 months Guideline range. I'm not certain how far down they could get it. [redacted]

**MR. STRAUSS:** [redacted]

**THE COURT:** [redacted]

**MR. STRAUSS:** [redacted]

**THE COURT:** All right. Well, let me think about this a little bit. We're going to have to recess this. I mean, I would have recessed at 11. But this is probably a good point to recess this. We're going to resume this sentencing at 1:30.

Mr. Strauss, I know you can do it, because you were supposed to be here at 1:30 on something else. So I know you can be here.

Mr. Merlino, Mr. Entin, is that a problem for you?

**MR. MERLINO:** Not a problem, Judge. I have a debrief I'm entering into, but Your Honor takes precedence.

**THE COURT:** Yeah. You can talk to Mr. Strauss about -- about that.

Mr. Entin.

**MR. ENTIN:** That would be fine, Your Honor.

**THE COURT:** Okay. We're going to resume at 1:30.

Mr. Strauss, here's what I want you to do. I want you to find out those numbers for me.

**MR. STRAUSS:** Yes, Your Honor.

**THE COURT:** I believe that what they've given me, what the defense has given me, I'm sure, is accurate. But I want you to talk to Jimmy Muench about that.

And I also want to know what happened to that money. I imagine -- I mean, this is -- normally, the government should

try to seize those assets before they lose value. I don't know why this wasn't done here. But there's nothing left -- the younger Mr. Camus turned over a lot of money. $230,000 is, in my opinion, a substantial amount of money.

**MR. STRAUSS:** Yes, Your Honor.

**THE COURT:** $50,000 is not so substantial when you're looking at $4 million. When you're looking at a 2-million-dollar -- the fact that he turned -- that he's turned over today at sentencing, 230,000 is substantial. When you're looking at a loss of 4 million, the fact that you've turned over 40,000 is not substantial. That's how I look at those numbers.

That's why I started out with how much did they have in their pocket, not what the business has gone down. I get all that. The business failed. I understand. And they've had difficult financial circumstances. I could get that reading the presentence report. And I understood the challenges that they were facing.

**MR. STRAUSS:** Yes, Your Honor.

**THE COURT:** You need to talk to somebody who can give you that information, because you weren't able to give it to me, Mr. Strauss.

Let's see what else. Okay. 2:00 p.m. We're going to recess till 2:00 p.m. So sorry. 2:00 p.m. So you need to find out that information for me.

And, you know, I'll tell you what I think. I think I probably am prepared to go forward with sentencing, based on what Mr. Strauss has told me. But I will be willing to hear whatever other information you wish to give me today. Thirteen months is a long time. It's just hard to sentence when you don't have all of the information. It's better to have it all at once.

[redacted] Sounds like he wants me to consider this. It sounds like he wants me to give a fair reduction in sentencing. It's kind of hard without something in front of me, quite frankly, but --

**MR. STRAUSS:** [redacted]

**THE COURT:** Well, you called that to my attention. You said you were under an obligation to call that to my

attention as a mitigating factor. So you're asking for the bottom of the Guidelines if, you know, so what would I reduce it on? I would reduce it on -- below the Guidelines, based on what they've paid to the government. [redacted] That's what you -- you know, when I started talking to him, that's what he started talking about. [redacted]

**MR. STRAUSS:** I understand they're requesting that, Your Honor. We do oppose it on those grounds. But the --

**THE COURT:** Okay.

**MR. ENTIN:** [redacted]

**THE COURT:** Mr. Entin, I thought about that too. I think that is an avenue that is absolutely possible, to allow them to defer -- which I normally do in white-collar cases, almost all the time. I can't think of one where I haven't done that, allowed them to self-surrender.

But in this case, you know, it could be a year from

now, two years from now, whatever it is, [redacted] I mean, that is a -- yes, that's actually -- may very well be the best way to proceed, quite frankly.

**MR. ENTIN:** [redacted]

**THE COURT:** Mr. Entin, yeah, I think that's the way to go, quite frankly. But I'll think about it. You-all need to have a conversation, make certain, at least, that you've had the opportunity to explore these ideas, one with the other. And, Mr. Strauss, you're going to get that information for me.

**MR. STRAUSS:** Yes, Your Honor.

**THE COURT:** Okay. All right. I don't think we've got anything else. I may be back here before 2:30 -- I mean, before 2:00. I may be back here at 1:30ish, but it may be a little closer to 2:00. So just bear with me. I've got to go to Clearwater. It's going to take me a little time to get over there and then come back for a bar meeting that I committed to attending. So I'll be back here as soon as I can.

All right. Thank you. We're in recess. I'm just going to stay here.

(Recess from 10:53 a.m. to 1:56 p.m.)

**THE COURT:** Thank you, everybody.

Okay. Well, we took our recess earlier in the day, and I said I would reconvene. I had heard from the government with respect to their proposed sentence, which is the bottom of the Guidelines. But I also told both sides to -- or three of you, to please talk to see if we -- if you had a position or agreement with respect to continuing this hearing. And, actually, what I heard from Mr. Entin earlier, you know, seems to make sense to me. And that is, I would impose a sentence that I think is fair and just based on, you know, the information that's been provided to me today, what I feel comfortable, you know, sentencing, based on that information.

But as to the sentence, that the defendants not be taken into -- or that the sentence not be executed until -- I would do something like, you know, December 31st, 2024, and it could be extended. Obviously, I think you said 13 months. But I'd just as soon do it at the end of the year and then revisit this. So that's sort of along the lines of what I was thinking, but I'd like to hear from you.

Mr. Strauss, I don't know if you were able to get that information for me that I had asked you from Jim Muench.

**MR. STRAUSS:** Yes, Your Honor.

**THE COURT:** Okay. So what's your position on this? You can come up to the podium. You know, the microphones just simply aren't great here. So I know that I can hear you well

if you come up to the podium.

**MR. STRAUSS:** Yes, Your Honor, of course. There's several questions that the Court asked regarding asset forfeiture and asset tracing.

**THE COURT:** Uh-huh.

**MR. STRAUSS:** You know, at the start, Your Honor, I would say that there was no tracing done in this case in the traditional sense. And primarily for that, on the investigative-team side of the criminal portion of the indictment, is that when we -- you entered into the plea agreement, we all agreed to the numbers. You know, from our side, there's no further need to, you know, look at where the assets went.

And then on the asset forfeiture side, I believe Mr. Muench and the team at the U.S. Attorney's Office looked into it, found some properties. And there's some particular reasons why only the posted amounts were -- I can elaborate for the Court. They did not do a tracing either in the traditional sense.

However, having located the properties, the two homes that were owned by Mr. Pablo -- I've learned the correct pronunciation is Camus over lunch, I'm going to try and speak correctly -- and Shane Camus to -- you know, they owned these homes. They're nice homes. They would typically have a much higher value than they did. However, they were severely

damaged by a recent storm at the time they were inspected.

And Mr. Muench and the team at the U.S. Attorney's Office had determined in negotiations with the defendants of what the ultimate value and equity would be and sort of what the trouble it would be at the U.S. Attorney's Office trying to force us to get the repairs made and force a sale. And they determined that amount to be $50,000 in equity as to Pablo, and $230,000 was remitted with regard to Shane.

Now, there's still the order of judgment, which there's a lien against the house if they ever try to sell it or refinance it in the future, from what I've been told, that the judgment has been posted as a lien. And there may be, you know, while there's no ongoing --

**THE COURT:** But they've reached an agreement as to the house. They've reached an agreement. Right? He paid $50,000, which represents his equity in the house. Right?

**MR. STRAUSS:** Yes, Your Honor.

**THE COURT:** So that's the agreement with respect to the house. The lis pendens would have been dismissed because they've reached an agreement. So now are they going to still record a judgment against that house?

**MR. STRAUSS:** My understanding was, it's already been recorded, Your Honor. And, again, forgive me for not --

**THE COURT:** You got -- but they got the 50,000. That was their -- I don't want to go down a rabbit hole. I'm not

certain that I expressed myself in a way that you were able to understand.

My concern is that, really, with seizing this asset, so that they could help satisfy the $4 million that was illegally taken from the United States government. That's very specific terms. And, normally, asset forfeiture is a way to satisfy those assets.

So in a roundabout way, it helps the defendant. The more that is satisfied from that judgment, the better it is for him, because he's made more of an effort, at least in my eyes.

So I was just trying to get to the -- that's -- I think you've done your best to answer my question. There's no need to go down more of a rabbit hole.

So it's 50 -- it's actually the answer the gentleman -- the lawyers had given me earlier. It was $50,000 for Mr. Pablo Camus, and 230,000, is that what it was for -- no. Let's see. I think those are my numbers. For the son, for Shane. Is that right? Am I off on that? 50,000 and 230.

**MR. STRAUSS:** Yes, Your Honor.

**THE COURT:** Okay. Anything else from -- well, and then your -- obviously, you said earlier you're fine with continuing it, and you don't have any problem with that.

**MR. STRAUSS:** No, Your Honor. Or the self-surrender. I believe U.S. Probation has also given the Court an update on their status. They've been compliant with their pretrial

conditions up until this point.

**THE COURT:** Let's see. I don't have anything after. I don't have anything today. But let's -- I don't want --

**MR. STRAUSS:** I believe it was yesterday. They at least e-mailed it to the parties that he's --

**THE COURT:** Oh, I know what you're talking about. Yes. Yes. I saw that yesterday, that email.

Okay. Thank you, Mr. Strauss.

So Mr. Entin, you had stood up? I couldn't tell. Somebody had stood up.

**MR. ENTIN:** No. I just wanted to let you know that email came out yesterday from pretrial service.

**THE COURT:** So, Mr. Entin, what's your position? Ready to move forward with sentencing then today, but giving them the opportunity to report or self-surrender sometime, I'll say not before December 31st --

**MR. ENTIN:** Yes, Your Honor.

**THE COURT:** -- of this year?

How about you, Mr. Merlino? Are you okay with that also?

**MR. MERLINO:** I'm okay with it, Judge. If I had my druthers, as the representative of Mr. Pablo Camus, I would ask that the whole thing be moved, for this reason. [redacted]

[redacted]

**THE COURT:** Well, you know, I really am kind of torn on this, Mr. Merlino. I am torn. But I think I can accomplish it. Push comes to shove, you've got a record here. You know, true, prosecutors come and go. I'm -- this is a lawyer from the Department of Justice, from main -- what section are you with, the fraud section?

**MR. STRAUSS:** The fraud section.

**THE COURT:** The fraud section. So I'm -- you know, we periodically deal with them. We normally deal with the U.S. Attorney's Office. So I'm not certain why this case was handled by the fraud section as opposed to the U.S. Attorney's Office. But you've got a pretty good record here. If there's an issue, I think you've got --

**MR. MERLINO:** I understand.

**THE COURT:** -- you know, something that you could certainly use in all fairness. So I'm -- I thought about it in

the two hours I've had since we were here earlier and -- our two and a half hours, I'm comfortable. I'm comfortable with proceeding.

So what I'm going to do, then, is I'm going to just continue with the sentencing. You can present whatever you would like. [redacted] And I will decide what I'm going to do with respect to that. [redacted] So I understand the importance and the role that this plays. So I'm ready to move forward.

So I'll ask -- I'll go with your client first, Mr. Merlino. Mr. Merlino, do you know of any reason why this Court should not now proceed with imposition of sentence? I understand that you would rather have sentence imposed, you know, a year and two months from now or a year and three months from now. I understand. But is there any legal bar to sentence today?

**MR. MERLINO:** No, Your Honor.

**THE COURT:** This is your opportunity to make a statement, present any information in mitigation of the sentence. And Mr. Camus, you have the right -- Mr. Pablo Camus, you have the right to address the Court directly. You don't have to, but at this juncture, I want to make certain that you understand that you have that right.

Do you understand that?

**THE DEFENDANT:** Yes, Your Honor.

**THE COURT:** Okay. Very good. So I'll hear you now, Mr. Merlino. The government has asked for a Guideline sentence, in essence, a sentence of 97 months. And you are free to, you know, argue for a variance, for a downward departure. I am going to turn to the material that you submitted to me, which I've had the opportunity to review, as well as the presentence report. And, actually, I do have in front of me the memorandum submitted by the pretrial services where they haven't had any problem with your client. Just double-checking. No problem at all with the way he's been --

**MR. MERLINO:** That's my understanding, Judge.

**THE COURT:** -- conducting himself while on pretrial release. But I do have your memorandum that was filed along with the attachments. The letters from -- I remember reading the letter from the sister who works for -- who worked for American Airlines, the brother who's been a tennis pro, about

the good family upbringing that he's had, the good stable family life he has today.

So those are the things that jumped out at me. I could see that, financially, they had some issues. It may very well be, that's what caused him to go into this direction as a business person. You know, sometimes you have ups and downs in business. And it's at least reading this, I could see that probably, you know, played a role. Other than that, he's had a pretty, you know, good life with respect to staying away from the criminal justice system.

**MR. MERLINO:** That's correct, Judge. No involvement whatsoever on the state level or the federal level with the criminal justice system. Thank goodness.

This case is a pure anomaly. There were just horrific factors and judgment calls and lack of reflection and lack of, you know, impulse control when money took over. And that word, that G word that we on the defense side don't like to use in white collar cases, but greed sets in. And, unfortunately, it led to bad things.

That's why we're here. That's why the government used up quite a lot of resources in investigating this, and they're still doing so with reference to those who these individuals have been involved with in the short -- relatively short amount of time, in 40 months.

But as Mr. Strauss said the other day, if I can quote

you, I actually wrote it down when you said it, [redacted]

**THE COURT:** Well, they have. They have dragged out. [redacted] These white-collar cases, you know, take their time. So I understand that.

**MR. MERLINO:** And, Judge, thank you. I did submit the sentencing memorandum document -- Docket Entry 161. Thank you for considering that. I'm not going to read it verbatim.

**THE COURT:** I have it right in front of me. I read it just yesterday, so I'm very familiar with it.

**MR. MERLINO:** I would like to thank you, Your Honor, again. As I said before, and I could go judge by judge in the Middle and Southern Districts of Florida where I practice primarily, but I have cases all over the country, and I can say never has a judge been in my view, in my opinion, so conscientious and so accommodating as to see the forest through the trees, know exactly what's going on, especially given your background and your experience on the bench, knowing, you know, what is happening, and allowing the individuals to try to attempt to mitigate their circumstances. I do appreciate that. I wanted to recognize that.

I want to compliment Mr. Strauss. He's come on the

case late, but he's hit the ground running. And he's been always available to us. And what he said earlier was much appreciated. I know we don't technically -- [redacted]

Judge, you know, in those cases that I handle in federal court where individuals choose the path of trying to mitigate circumstances, whether it's a debrief or just accepting responsibility, meeting with prosecutors under the somewhat protection of a Kastigar letter, this was a little different. I came into contact with both Shane and Pablo, I believe it was July or August of 2020. They came to me fully conscientious of a possible problem that would come up. And at that time, I was just getting involved. And I've handled several of the prosecutions, mainly in the Middle District here, involving Operation Brace Yourself, as you know that this is a product of.

And what is not normal, their bank gave them or made them privy to a letter that the federal government had asked for their bank records. And on that alone, not a knock at the door, not an agent meeting them in a parking lot as they're leaving their office, not because they received a target letter, they got a letter from the bank that said the federal

government had asked for their records.

**THE COURT:** Okay. That was the first inkling that they had?

**MR. MERLINO:** First thing. And I forgot who had given them my name. They came into my office, and they laid it out. As I -- as part of my practice, I play devil's advocate. I play the role -- having been one a million years ago, a prosecutor, because I want to see what the extent or the worst-case scenario is up front, so I can possibly judge the complexity and seriousness of what's coming, and especially with reference to loss, as I mentioned earlier. I did so. And in that catharsis between the two of them, I can say, unlike a lot of my clients, they were open an honest and self-deprecating with respect to what had gone on during that 40-odd months.

And they took my advice right then, [redacted] they ceased all activity with regard to all entities and that business practice in general.

They immediately gave me permission to reach out to the U.S. Attorney's Office. I think it was Mr. Anderson, if not, it was Mitch -- Mitch Malone, who I've spoken to, but I believe it was you first. [redacted]

[redacted]

THE COURT: Well, they're -- right now they're not asking for anything. They're just saying the bottom of the Guidelines.

MR. MERLINO: Right. I want to provide Your Honor

with just a thumbnail sketch of where we are.

**THE COURT:** Sure. Of course.

**MR. MERLINO:** [redacted]

**THE COURT:** Okay.

**MR. MERLINO:** -- until that time. [redacted]

**THE COURT:** Well, he was -- that sentencing has been moved.

**MR. MERLINO:** Yes, I saw that.

**THE COURT:** Yeah. But it is in front of me, yes.

**MR. MERLINO:** However, Daniel at one time was very close with them. Considered even, you know, a family member. [redacted]

[redacted]

We have -- let me see here. [redacted]

Judge, the terms acceptance of responsibility, I mean, should be magnified here, based upon the proactive nature and the conscientiousness of them simply receiving a letter from PNC Bank about their records being taken here, and them knowing and addressing and identifying what it was about. They read between the lines. They in no way, shape, or form came into my office and were assigning blame elsewhere or trying to minimize the situation. They fully comprehended the circumstances.

And when I enlightened them as to what effect that would have and what possible violations of federal law could come into play and what the Sentencing Guidelines were, statutory maximums included, but what the relevant statutory Guidelines were, they immediately respected that fact and

worked immediately to mitigate those circumstances.

Their conduct while on a pretrial release, Judge, as you read in that report, has been nothing but stellar. They've continued to work, but not to the degree -- basically getting by, as you see what the financials show.

And if he could, Pablo would pay every cent of that money to you today before sentencing. I just had a similar case up in Atlanta in the Northern District of Georgia. The full restitution was -- three quarters of a million dollars was paid before sentencing.

Again, I'm not asking for it, nor did they seek a ticket to escape incarceration, given the Guidelines that were relevant there; however, a variance was not granted on that basis, as it was the responsibility of the defendant to do so anyway, was the message that was provided by the judge. I understand that.

**THE COURT:** Different people have different philosophies. I've had prosecutors say to me they don't agree with my reducing a sentence when I have somebody who's made restitution in full. But I think it's probably one of the most important components of acceptance of responsibility.

Again, I've seen a lot of people whose families have come together. They've made financial sacrifices. If you don't collect the money at sentencing, it's very hard to get it afterwards. I have seen people who have done it, but it's very

hard. This is when it makes a difference. So this is when they're going to do it.

**MR. MERLINO:** On that point, I know this for certain, I've known this man now for four years. He's a spiritual man. He's a family man. I would even consider it -- I've never used this term in a sentencing presentation in all my career. I consider him a friend.

And I know for sure that if he had the means and the ability not only to impress this Court, but to do the right thing, to make the government whole again. He would provide every penny of what he's responsible for. I could say that without a doubt.

We indicated before, Judge, he has no criminal history. He's 68 years old. He has some health issues with regard to cardia. He had some recent medical procedures done with regard to that. He suffers from anxiety.

All in all, he's led a stellar life. And this horrific judgment call, which he, to this day, regrets not only being involved with, but involving his son, no less. I mean, the --

**THE COURT:** Well, yes.

**MR. MERLINO:** -- light of his life, the center of his universe, haunts him to a degree that is just unfathomable. I respect the fact that he feels that way. And despite that fact, he and Shane remain closer than any father, son could

possibly be.

This case, of course, is truly white-collar case. There's no force or violence or any threats of same being bestowed upon any victim in this case. Your Honor knows the facts of the case. It's apparently clear. You've made that abundantly clear in your questioning from the get-go today.

With regard to parity, a little research to update what my memory had with regard to health-care cases, federal health-care cases in particularly. And as I stated in my sentencing memorandum on Page 13, statistics from the United States Sentencing Commission indicate that the average sentence for a health-care fraud offender is 30 months of incarceration.

I gave the Court the link in the cite to where that could be found. It's the USSC.gov site that I commonly go to looking for statistics, in particular, cases in particular fact situations in those cases.

What is more, these statistics reveal that nearly 50 percent of all health-care fraud offenders receive a variance from their stated Guideline range. In fact, 47 -- 47.6 percent of offenders receive such a variance.

Mr. Camus, his recommended sentence is actually five years longer than the average sentence of a similarly situated offender at the bottom of the stated range, as we know here, by, I believe it's one month. Looking at the Guideline range, it exceeds the statutory maximum, which shows that the

Guidelines are overstated.

In addition, per the United States Sentencing Commission report, the variance referenced, as I just referenced, does not include offenders who receive sentencing departures based upon substantial assistance.

**THE COURT:** What drives it is the amount of the loss.

**MR. MERLINO:** Excuse me?

**THE COURT:** That's why his -- what is driving his higher Guidelines is the amount of loss.

**MR. MERLINO:** Yes, yes. That's what we look for when we first assess, you know, the level of culpability when we get these cases.

In addition to that, I think goes hand in hand, on that loss issue, I think there's more -- whether it be legislation or case law to be made, we know we're dealing with banks. I think it's still uncertain in the Eleventh. Banks is the clearest with regard to what should be utilized. They look at the pure definition of loss. Should it be intended, should it be actual. Seems like Your Honor has been focused on the actual. I do appreciate that. I would like Your Honor just, in equity, to focus on that also.

I believe in doing the calculations, it would make a difference, rather than a two-level enhancement that would -- excuse me, rather than a three-level enhancement, it would be a two-level enhancement. But, you know, it's something in the

right direction, as well as the plethora of other bases that I provided for the 3553(a) factors.

Your Honor, in all, we're asking for a reasonable sentence. I believe, given his age, the fact he's never been involved in the criminal justice system, in looking at the statistics also, someone situated such as he is and with this type of case, his -- the chance of him being a recidivist is slim to none. I think just based upon what he did and his personal characteristics of how he accepted responsibility here would indicate that as well.

And in reviewing the sentencing factors, Judge, I believe at this junction, I know we're looking at this, you know, in a vacuum, so to speak, [redacted] --

**THE COURT:** [redacted]

So you're certainly free to continue to bring it up. You have brought it up for sure. And you can expand if you'd like or just let it be.

**MR. MERLINO:** What I would do, Your Honor, because today we were here on the general -- that's why I didn't even

mention it in my sentencing memorandum.

**THE COURT:** Okay.

**MR. MERLINO:** That was a highlight, obviously.

**THE COURT:** Okay.

**MR. MERLINO:** But because we're still working toward that and was the basis of --

**THE COURT:** Okay.

**MR. MERLINO:** -- thought of a continuance, let alone a delayed surrender, I will provide you not only with the specifics. [redacted] But I ask Your Honor for a jump-off point that is commensurate with the statistics of those in similar situations in these types of cases. I know the driving force is the loss amount. I would ask Your Honor to consider the actual here, and the fact that this individual, as I said earlier, was driving a Hyundai when

I met him. Lived in a modest house. Had only -- it had some damage, but not the extent that Shane Camus's house did.

The only value he had above and beyond what he owed on the mortgage was what he provided to Mr. Muench through early paid restitution. Other than that, the finances, we have no problem with the finances as they're outlined in the pretrial services report. That's as we understand them. I reviewed that with my client. As I said before, Judge, if he could write you a check today, to the US government, in making them whole again with respect to his involvement, I know he would.

With that, Your Honor, I thank you.

**THE COURT:** So I'm sorry. What sentence are you asking for today?

**MR. MERLINO:** I would ask for a 30-month sentence, Judge, at this point.

**THE COURT:** Thank you.

**MR. MERLINO:** Also, I do have a witness. His wife would like to say a few words to the court. Would you like her to come to the lectern?

**THE COURT:** To the lectern is perfectly fine.

**MR. MERLINO:** Also Mr. Pablo Camus has an allocution for Your Honor.

**THE COURT:** Absolutely.

Just state your name. I know you're his wife, but

state your name so we have it.

**MS. ROBIN CAMUS:** My name is Robin Camus.

**THE COURT:** All right.

**MS. ROBIN CAMUS:** This is the first time -- no, the second time in my life I've ever spoken in front of people. So please forgive me.

Obviously, you know I'm the wife of Pablo and the mother of Shane. I will actually start with telling you a bit about myself. I come from a large family in a very small town in Mass. My life, since I've been with my husband, has been greatly improved. Sorry. He taught me patience, unconditional love, and the value of family and faith. My husband has always put the needs of his family before his and is an example to call in many ways, especially on being a father. We have been together for 38 years.

Now, let me -- now, let me share my thoughts on Shane. Pablo and I knew we wanted children right away, but that's not how it worked out. It took us over four and a half years to conceive. We were over the moon, and I loved every moment of being pregnant. Well, I must admit, we did something right, and that's Shane.

He grew up surrounded by love and values, values that are slowly disappearing from kids today. Values such as dinner at the table every night, making three sacraments, how to be self-sufficient, and count on yourself. Shane has surpassed

all of our expectations. He's loving, kind, smart, and driven. And best of all, he married Emily, who is the best blessing in our little family. Thank you for listening.

**THE COURT:** Thank you.

**MR. MERLINO:** With permission, may the defendant move to the lectern.

**THE COURT:** He can stay seated or he can stand, whatever he prefers.

**MR. MERLINO:** He would like to stand before the Court.

**THE COURT:** Whichever is easier. You may proceed.

**DEFENDANT PABLO CAMUS:** Hello, Your Honor. How are you?

**THE COURT:** Just move the microphone up just a little bit there. Thank you. Uh-huh.

**DEFENDANT PABLO CAMUS:** Hello. How are you, Your Honor? I just want to say a few things. As hard as it is to be standing in this court today, I have been looking forward to this day to be in front of you and just speak what is in my mind.

Little bit about myself. I was born and raised in Santiago, Chile. Two beautiful, wonderful parents who raised me with the most important values. One, that I carry on forever is family. Second one is integrity and perseverance and tenacity. Those are things that I grew up with and my

parents taught me.

They gave me a great education. I went to 12 year of (speaking Spanish), which gave me a great education. And at the end of 17, just turned 18, I was blessed to come to the United States on tennis scholarship, which I went two years to Texas, and then two years to Tennessee.

My life, with all this up and down, I always have the faith, and I have so many blessings. The first blessing after graduating was meeting my wife. We've been together for 38 years. A wonderful woman, loving, caring, with the patience of a saint to put up with me, with all that up and down, taken things, and I guess to death do us apart, as we say.

We tried to have a family for four or five years. We did everything. We tried in vitro. I even went to surgery on myself and nothing. Then few years after, I was able to buy a first home in Davie with an acre of land where she -- that she's an animal lover. I was able to provide. She got her horse, her pig, dogs, chickens. And four months after, she got pregnant completely natural. And that was another blessing. Blessed with our son, that he's everything to us. We raised him with the same values, family, integrity, tenacity, which is the same values that my parents raised me.

Shane, as growing up, teenagers, 16, 17 years old, he always used to come to me and my wife, and he was crazy that he wanted to have a tattoo. My wife and I were not very crazy

about it. And we told him that that will never happen while he lived under our roof. But when he moved out on his own, he can make his own decision. Well, he did. Years later, he moved out, went to school to become a nurse, which he graduated first of his class.

And one day he comes to me and say, Dad, I have to show you something. I said, oh boy. What is it?

He opens his shirt and he showed me this tattoo of his chest with a human heart, because he was in nursing school. Right above, a line stating walk by faith, not by sight. Right underneath the heart, says, never, never give up.

And to sweeten the blow, right above his shoulder, he has my date of birth, his mother's date of birth in Roman numbers. And, thank God, that's the last tattoo he had.

When I was in the office, and I received that letter from PNC Bank, I immediately read it, froze, start thinking, talked to Shane, and I said, son, this is another blessing, and we need to go on and seek counsel in this, because this is something very serious.

The blessing is we should have never received that letter. I went, made an appointment with my attorney, Richard Merlino, and immediately, as he said it before, he give his advice to stop everything right away, which we did on the spot. [redacted]

[redacted]

And, to me, that was another blessing, because I don't know, Richard, I don't know, Mike, how I would be able to navigate through all this without your support and your advice. This is really from the heart.

Also, when I stand here, tell you how sorry I am, how remorseful I am for everything that it caused, dragged my family, my son through this entire mess.

He has a tremendous future ahead of him, and this is going to be a blemish. And I ask you, Your Honor, and the Court, if there's any way possible to be lenient on my son for this specific reason that I just mentioned to you.

If I have to do it, no. If I knew what I was going to be facing, believe me, I would never, never even get close to this business. I've been in business for all my life. Never have any blemish or anything. I remember when I had to get my Global Entry, they checked me out up and down and everything, and I got my Global Entry because I kept an impeccable record and lifestyle.

Now, when I say that I'm far from being a saint, but I'm a tremendous man of faith. Ever since we knew we were going to be sentenced, about over a year ago, on my way to work, I stop in a small, little chapel, couple minutes to give thanks to God, and to please enlight you, Your Honor, our

attorneys, our prosecutor, whoever has some type of control on our life. And the rest, I just cast away to Jesus, because at the end of the day, he has to find Jesus. He's in control.

Again, extremely sorry, and thank you for listening. Thank you, Your Honor.

**THE COURT:** Okay. All right. Thank you very much, Mr. Camus.

Anything else, Mr. Merlino? I'm going to sentence both gentlemen at the same time. But is there anything else?

**MR. MERLINO:** Nothing further at this time, Judge. Thank you.

**THE COURT:** Thank you very much.

All right. Mr. Entin, I'll turn to you. Do you know of any reason why this Court should not now proceed with imposition of sentence? In other words, is there any legal bar with sentence being imposed today?

**MR. ENTIN:** No, Your Honor.

**THE COURT:** This is your opportunity to make a statement, present any information in mitigation of the sentence.

And, also, Mr. Camus, you have the right to address the Court directly, just like your father did. You don't have to, but I want to make certain that you understand that you have that right. Do you understand that?

**DEFENDANT SHANE CAMUS:** Yes.

**THE COURT:** Okay. Thank you.

You may proceed, Mr. Entin.

**MR. ENTIN:** Thank you, Your Honor.

Although we have not contested the Guidelines nor do we intend to do so, I'd like to point out some things that I would ask the Court to at least look at as to why the Guidelines may be overstated in this case.

Basically, Mr. Shane Camus scores between 97 and 121 with 120 being the statutory max. Some of the things that may have affected those Guidelines would have been, he comes in here with no criminal history at all, would have probably qualified for 4C1.1, zero -- zero offender, two-level reduction.

But because he had a two-level role enhancement, he does not qualify for that. And so, basically, there's a four-level issue there on the small supervisory role he had.

Again, as Mr. Merlino pointed out, under Banks, I mean, if you looked at the actual loss, it's far less than the intended loss. The actual loss was six-million-799 versus $15 million, which would have affected the Guideline range as well.

And I know the Guidelines are the law, and I know they are advisory. But I just wanted to point that out to the Court.

Turning to 18 U.S.C. 3553 factors, Shane Camus's life

hasn't been very long, as he stands here. He graduated high school in 2012, when he was 18 years old. And throughout middle school and high school, he was a completely normal boy. He liked sports. He liked ATV riding. He did a lot with computers. He was interested in Internet gaming. He got good grades in school. He graduated from Western High School in Broward County, Florida, had no issues in high school. And I think he had one thing with his dirt bike, which was a fleeing thing as a juvenile. But other than that, no issues of any behavioral problems, any issues in school. And graduates at 18, doing everything he could to be a good boy.

He graduates. There's a financial issue in the family. He takes a job at Rainforest Cafe. He takes a job at Lucille's Diner. He takes a job at Quarterdeck. And works various jobs between 2012 and 2014. Tries to collect some money so that he can pursue his career and his dream at that time to become a nurse. And is successfully able to accomplish that and start that process in 2014.

2014, he's basically 20 years old, 19 or 20 years old. What does he do? He goes to nursing school.

**THE COURT:** Uh-huh.

**MR. ENTIN:** And he starts nursing school in 2014. He spends two years becoming a registered nurse, which was his dream and desire at that time. And he obtains also an AA degree, and he obtains a very high GPA and a very high position

in the graduating class and is able to obtain a registered nurse license shortly thereafter from the state of Florida.

He's about 21 at that point.

**THE COURT:** Okay.

**MR. ENTIN:** He gets a job. He goes to his first job is with Arch Plaza Rehab, a nursing home facility in Miami. He works there for one year. He helps elderly and sick people. There's some letters that show you that, even on one occasion, he saved someone's life and administered CPR and helped them.

And some of the letters that have been provided to you substantiate his achievements while he was a nurse in that short period of time. And then pursues to the next level of a job with comprehensive health services where he was contracted with Health and Human Services, HHS, and worked at a refuge settlement facility in Homestead where he took care of children who had no families, who were immigrants, who had crossed our border, and they were unaccompanied minors, who assisted and really found great satisfaction in that job.

**THE COURT:** Uh-huh.

**MR. ENTIN:** Unfortunately, in 2017, the facility was closed and his position was terminated, and he was left at that time without a job.

Between 2017 and 2020 is where this criminal activity takes place. So he spends now from his 23rd year of life to roughly -- 22 years old to 25, involved allegedly -- or

involved in this activity. [redacted]

That's what brings us here today with him. He's had a short life. What happens is, he's on a perfect track. He's 21 or 22, and I don't know how to say this any other way, his father has a marketing company. His father is already in business, already operating. He's not employed and not of a position to make money at that time, and looks up to his father, and gets involved in the business, and tries to achieve to make his father and people happy. There was nothing in his life before that motivated him by money. There's nothing really that motivates him by money.

And so what he does is, he goes there for three years, works daily with his father, works -- meets people that are much older than him that he's taking advice from, meets some professionals along the way that are giving him information of what he should do, and relying on all these people, knowing possibly it's wrong, or it is wrong now. He knows it for sure. But, you know, learning through that process of the magnitude of what was taking place.

And then comes in, as Mr. Merlino says, and as soon as he finds out for sure with a letter, quits. So I think he's in a different position than his father.

**THE COURT:** I think he is also.

**MR. ENTIN:** Thank you. And so this is a wonderful kid who had an unblemished life. And I think he'll rise from this. But he had an unblemished life, who did nothing but good, until he got into this thing for the two or three years. So with that being said, you know, that brings us here today.

He has, as Mr. Merlino has pointed out, and I won't continue and relive it again, and the record here is public, so I don't want to give you specifics.

[redacted]

[redacted] So, you know, for that, I would ask you to consider that as well.

He has deep remorse. He suffers from anxiety. He had anxiety before this. He calls me every day for -- just to see if I'm alive, I think. But he calls me every day for five years. And, normally, I would really be upset, but I sort of like him. So I let him call me every day and just waste my time. But I talk to him every day. He had sleepless nights. He's seeking treatment. He's taking some medication and trying to get through this. But he is deeply remorseful and can't even understand every day and spends every day trying to figure out what he got himself into.

He has not a extravagant life. They have a home. You know, lives like someone his age generally, you know, middle class. I mean, he never bought anything extravagant, crazy. Didn't seem to be motivated by that.

And then so he -- he comes to meet Emily. So he meets Emily. And now the letters come, and he's facing criminal prosecution. And how he's ever so lucky to meet Emily, I don't know. But Emily has got a BA degree in health

service administration, a master's degree in business administration. Is a wonderful person. They have a loving strong relationship. Very supportive of each other. Know that -- the consequences of what he's facing, and have deep, deep love and commitment to each other.

And they meet, and at the peril of what happens, they get married. And Emily's mother, who's here today, will say a few words, is a lawyer. And I think it speaks volumes that she, knowing he has this problem, still thinks he's a wonderful human being for her daughter.

And her father is a -- who couldn't -- may have been some ethical reasons, but he's a judge. And, you know, again, he condoned them being together and actually are quite happy that they are now a couple and married. So they got married in August. I think that's going to additionally keep him on the right track.

And I think this is really an aberration in this young man's life, because the letters do support he's kindhearted, giving. His job performance has shown he's been able to do that. He is compassionate. He's extremely bright and can be very productive if he puts it in the right way. And so I think those are really important issues for the Court to consider.

As far as recidivism goes, I'd be shocked if he ever comes back. I think he's a very low risk. His background

would support that. His remorse would support that. His lack of criminal history would support that. [redacted] And then I think a less severe, a less sentence, far less sentence would be sufficient for him.

His pretrial services report, which we discussed briefly, indicates he is extremely amenable to supervision. He's always doing what he's supposed to do. He's always been compliant every day throughout the process. And even before he went on supervision, was always responsible with law enforcement and matters related to the case.

So for those reasons, Your Honor, I would ask you to vary far downward. I think there's a bigger picture here that the Court needs to look at. And that is, I think he got into this -- there's a punishment for doing it, and there's a punishment for what he watched, involved himself in in happening over those several years.

But I think at his age, and what he had come from, and the type of work he was doing, and going in there with the lack of sophistication that he had, being dominated by family influence, an adult influence, such as people like Mr. Espinoza and other people, who would ask him to do things all the time at his young age, I think are really important considerations the Court should look at.

For those reasons, I would ask you to vary far

downward.

**THE COURT:** Would you like to propose a sentence? You don't have to.

**MR. ENTIN:** I would ask for 18 months.

**THE COURT:** Thank you. All right.

Mr. Camus, do you wish to make --

**MR. ENTIN:** We have two witnesses.

**THE COURT:** Oh, please. Absolutely.

**MR. ENTIN:** They came from Fort Lauderdale.

**THE COURT:** Absolutely. No, no, no. I had forgotten. You did say something. The mother-in-law. Uh-huh. Absolutely.

**MR. ENTIN:** Anna -- I'm sorry, Maria. Thank you.

**THE COURT:** Just move that microphone down.

**MS. RODRIGUEZ LEWIS:** Good afternoon. Can you see me?

**THE COURT:** I can. I can.

**MS. RODRIGUEZ LEWIS:** Good afternoon, Your Honor. I'm Maria Rodriguez Lewis, and I'm going to read. I am -- as you know already, I'm an attorney, and I've been practicing in South Florida area for over 40 years. And I also have been married to my husband for over 36 years. He's a judge of compensation claims for the State of Florida. And I am the proud mother of three wonderful grown-up daughters, who are professionals. I am also the proud, proud mother-in-law of

Shane Camus.

I believe my training and experience has made me a good judge of character. My fervent hope for my daughters was for them to find a partner who was kind, caring, and respectful. Shane is the embodiment of all those qualities. Shane's concerns for and desires were to help other people, and manifested himself early on when he decided to enter the field of nursing.

I know Shane to be a good person and a very good -- a very hardworking one, industrious and productive member of our staff in the community. I also know Shane to be of the highest ethical and moral character. I am impressed by his hard work, good nature, and desire to help others.

I know that the legal difficulties with Shane has found himself and weighs heavily upon him. It saddens me to know the person he is, that he finds himself in this situation. I know Shane had the best intentions to establish the business to help provide for his employees and parents. In fact, Shane sold his truck, invested all of his savings, and moved back home with his parents in order to start a business with Pablo Camus, his father, and help the parents financially.

On behalf of Shane Camus, I am respectfully requesting the Honorable Court take into consideration all of the qualities I mentioned. [redacted],

has no prior criminal history and has an excellent moral character, I pray that leniency be shown with a fair and just account to these proceedings.

Thank you for your kind consideration. And again, it is my hope that Shane and my daughter will be able to enjoy their lives together. I hope for leniency for Pablo and Shane so they may put this matter behind them. For Shane and Emily, I hope they can grow together, start a family, and enjoy their lives. Thank you, Your Honor, for allowing me the opportunity to express my feelings today. Thank you.

**THE COURT:** Thank you for having come over from the east coast and saying those words.

**MS. EMILY LEWIS:** Good afternoon, Your Honor.

**THE COURT:** Good afternoon.

**MS. EMILY LEWIS:** I wanted to introduce myself. My name is Emily, and I'm the wife of Shane and daughter-in-law to Pablo. I'm a proud daughter to an Honorable Judge Daniel Lewis and Attorney Maria Lewis.

I met Shane, my husband, as he was finishing nursing school and starting his first job as registered nurse. I fell for Shane due to his drive to work hard, not for hisself, but for his family, a family I'm happy to now be a part of. I can happily say I love my in-laws. I'm so blessed to call them my family.

Shane has told me all about the past they have

endured, and how he never wanted his mom to worry about where to live, and to help his dad finally retire, as he has worked his whole life trying to provide for his family.

Shane was so driven that he would give up hanging out with his friends to focus on a career where he could make his family's dreams come true. Shane is not only smart, but he is caring. I would say he cares more than any other individual I have met. Due to that, he has a drive greater than any other individual I have met. I know he puts his all into his dreams, as his dreams are for his family. My husband sees the path he is meant to take and God is leading him towards.

I have spent eight years with Shane learning to grow and live together. Getting married is one of the easiest decisions I have ever made. When I said yes to Shane during his proposing back in 2019, I knew this was the man I would spend the rest of my life with. We picked out our wedding date, and I cannot express enough gratitude and appreciation for you allowing us the time on our wedding day.

These last four years have been the toughest we, the Camus family, have had to endure. I have personally watched Shane and Pablo struggle to stay positive when I know their past eats at them. The situation burdens Shane heavily, and he is trying to do everything possible he can to help.

He has pushed that same drive to give as much assistance, support, and info to help this Court [redacted]

[redacted].

I have watched him grow into a stronger man, changing to be better and smarter in all that he does. He has -- it has been tough knowing I cannot take on his burden, but he has made up his mind to give as much assistance, and once he does, he never goes back on his word. [redacted]

All I ask is that you allow him to continue to walk the path set before him, as he will use every moment to keep helping his community, his family, and all those around them to the best of their ability. I ask you to see the man I see and understand his passions and dreams.

Thank you, Your Honor, for allowing me the opportunity to speak to share my words and feelings with you in this Court.

**THE COURT:** Thank you very much.

Does the defendant wish to say anything?

**MR. ENTIN:** Yes, he does, Your Honor.

**THE COURT:** All right. You may proceed.

**MR. ENTIN:** You can go to the lectern.

**DEFENDANT SHANE CAMUS:** Hello, Your Honor.

**THE COURT:** You may proceed. Go ahead.

**DEFENDANT SHANE CAMUS:** I wanted to start with my upbringing and how I was raised. I always watched, you know,

my father and many businesses, always doing the right thing, and never, you know, having a blemish on his record. You know, he's not just my father, but also -- sorry.

**THE COURT:** It's all right. Take your time.

**DEFENDANT SHANE CAMUS:** But also my best friend -- also my best friend and my best -- I remember before I started my career in nursing, you know, my family losing our home that we grew up in. And if it wasn't for one of my mom's friends, one of her animal-loving friends, our family, we would have been homeless for six months. They let us kindly live in their home, you know, rent-free, and gave us the opportunity for my family to get back on our feet.

Around that time, I started my career in nursing when we experienced that, and eventually graduated nursing school. And life seemed to be going in the right direction. My father got a new job. And like I said, life was going in the right direction.

And within the same two weeks, the office of refugee resettlement closed down, and my father had lost his job. Growing up, I always wanted to see my family be whole and financially stable, and one of my biggest dreams, since I was a little kid, was to work with my father. When we both lost our jobs, and he asked me to join and go work with him, it was like a dream come true. And we continued from there.

You know, as a nurse, ignorantly, I thought I knew a

lot about health care. And I thought I knew a lot about compliance and regulations, you know, when I was working in a nursing home. And that was kind of the role I took on when my father did the marketing.

When we entered this space, it was -- it looked normal to me. You know, everyone was a professional, doctors, pharmacists, businessman, firefighters, just normal, clean-cut individuals. And so I thought we were going in the right direction at first. And we're going to finally establish, you know, a long-lasting success for our family.

Sorry.

**THE COURT:** It's all right. Take your time.

**DEFENDANT SHANE CAMUS:** I can't remember everything.

**THE COURT:** It's okay.

**DEFENDANT SHANE CAMUS:** You know, the first time it felt like we were back on track. And one of the best opportunities, while operating those businesses, was to be able to employ certain individuals, our employees that became like family to us, you know. I think, at a time, we had 20 employees here in Fort Lauderdale, and they were all great people. We didn't have one person quit, you know. So they obviously loved us, and we loved them very much, as well.

And later on, you know, a couple years into the career, for lack of a better word, we saw a lot less professional individuals starting to enter this space. I don't

know how to describe it, but sketchy-looking people, not the clean-cut people I saw when we first started.

That, you know, is when I got my first gut feeling of, you know, what's -- what's up with this business, you know, if you will. Well, shortly, later, we accidentally, you know, got this letter from PNC. And I -- I took that as a sign from God. As soon as we realized, you know, what we were doing, without a question, was wrong, we did our best and immediately stopped. And that's when we, you know, met Richard Merlino, and shortly after, Michael. And one of the hardest things was having to let, you know, 25-plus employees go that, you know, we promised a long-lasting career. That was pretty hard to do.

As time has passed, I have realized the damage we have caused from our mistakes and ignoring our gut feelings. So, you know, I want to apologize to the government for the resources that were spent, the patients whose health-care benefits we selfishly exploited, our past employees that we promised long careers to, and also my friends and family, especially my wife for putting her in this predicament and stress over the last four years.

You know, this mistake has really haunted me over the last four years. It has put constant stress on my wife, my mother. Has given me a lot of nightmares and sleepless nights. And it has impacted us financially and has put us in multiple predicaments that I can ever imagine.

**THE COURT:** Well, I am impressed, regardless of the circumstances, about the amount of money that you agreed to turn over to the government. And I intend to factor that in, as well as your age, the fact that this was your father -- I don't expect you to say too much, because it's your father. But I, you know, understand family dynamics and how these things work. So I believe I've factored those things in, and, you know, the fact that your wife and her mother have come in here and spoken on your behalf, I think that says a lot about you.

**DEFENDANT SHANE CAMUS:** I appreciate that, Your Honor.

And one of the things I wanted to let you know is, in most circumstances, many people would have given up on their dreams and moved on. You know, as bold as the statement sounds, I want to let you know that the dreams for myself and my family have not died, but they have just changed direction.

There is a new goal in front of us, and that is to make up for the damage I caused. I'm not only willing, but I'm extremely thankful for you -- to you, Your Honor, to the prosecutor, to the US government, [redacted]. If there's one thing about me that my father has taught me, it's to never ever give up. I can say with 110 percent certainty in any way whatsoever, [redacted]

[redacted], I will do whatever I can possibly do to grow in my career and work towards paying off the rest of this restitution as fast as possible. I simply and humbly ask that you continue to give me the opportunity to do so. That's all.

**THE COURT:** All right. Thank you.

**DEFENDANT SHANE CAMUS:** Thank you.

**THE COURT:** Mr. Entin, anything else?

**MR. ENTIN:** No, Your Honor.

**THE COURT:** Ready to proceed to sentencing?

All right. Anything else from anybody? You can stay seated. There's no need to stand. The Court has asked -- yes, Mr. Strauss.

**MR. STRAUSS:** Your Honor, I don't believe I moved for the additional one-point reduction. I just wanted to get that on the --

**THE COURT:** Hasn't this -- that hasn't been factored in?

**MR. STRAUSS:** It has been factored into the Guidelines, Your Honor. I just didn't move on the record.

**THE COURT:** You don't need to do that. We never -- that's not done in this -- that's not the practice in this district. It's already factored in. So there's no need to do that.

Was there anything else?

I mean, it has been factored in, right, in the Guidelines in the sentence?

**THE PROBATION OFFICER:** Yes, Your Honor. It's been calculated in the Guidelines.

**MR. STRAUSS:** Your Honor, I just didn't want you to pronounce sentence. I apologize.

**THE COURT:** No. You -- I mean, maybe in other districts, they do it differently. We don't have that culture to do it this way in this district. I mean, maybe some old-time prosecutors might do that that way, but it's not the way it's commonly done today, so -- all right.

Anything else?

All right. The Court has asked the defendant why -- each defendant why judgment should not now be pronounced, and after hearing the defendants' response, the Court has found no cause to the contrary. The parties have made statements in their behalf or waived the opportunity to do so. And the Court has reviewed the presentence report and the advisory Guidelines.

Pursuant to Title 18 United States Code Sections 3551 and 3553, it is the judgment of the Court that the defendant, Pablo Garces Camus, is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 78 months, and Shane Paul Camus is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 60 months.

Upon release from imprisonment, you shall each serve a term of three years' supervised release.

While on supervised release, you shall comply with the mandatory and standard conditions adopted by the Court in the Middle District of Florida, which can be found at 5D1.3(a) and (c) of the United States Sentencing Guidelines.

In addition, you shall comply with the following special conditions:

You shall be prohibited from incurring new credit charges, opening additional lines of credit, or obligating yourself for any major purchases without approval of the probation officer. You shall provide the probation officer access to any requested financial information.

Having been convicted of a qualifying felony, you must cooperate in the collection of DNA, as directed by the probation officer.

The mandatory drug testing requirements of the Violent Crime Control Act are suspended. However, you must submit to random drug testing not to exceed 104 tests per year.

You shall pay restitution in the amount of $6,799,581.52 to Medicare. This restitution obligation shall be payable to the clerk, United States District Court, for distribution to the victims. Restitution shall be paid jointly and severally, let's see, for Mr. Pablo Garces Camus with Shane Paul Camus and Daniel David Espinoza. And for Shane Paul

Camus, it shall be paid jointly and severally with Pablo Camus and David -- I'm sorry, Daniel David Espinoza.

While in Bureau of Prisons' custody, you shall either, one, pay at least $25 quarterly, if you have a nonUNICOR job, or, two, pay at least 50 percent of your monthly earnings, if you have a UNICOR job.

Upon release from custody, you are ordered to begin making payments of $500 per month. And this payment schedule shall continue until such time as the Court is notified by the defendant, the victim, or the government if there has been a material change in your ability to pay. The Court finds the defendant does not have the ability to pay interest, and the Court waives the interest requirement for the restitution.

Based on the financial status of the defendant, the Court waives imposition of a fine.

That's for both defendants.

Let's see. The forfeitures have all been resolved, Mr. Strauss, it sounds like. Do I need to make a -- do a final order of forfeiture today, or has everything been resolved.

**MR. STRAUSS:** It has not all been resolved, Your Honor.

**THE COURT:** Okay. All right. It's further ordered that the defendant shall pay the United States a special assessment of $100, which shall be due immediately. After considering the advisory sentencing Guidelines and all the

factors identified in Title 18 United States Code Sections 3553(a)(1) through (7), the Court finds that the sentence imposed is sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing.

So I'll tell you why I've sentenced you each as I have. [redacted]

Why did I sentence as I did? So, Mr. Pablo Garces Camus, you were looking at a Guideline sentence of 97 months to 120 months. Your lawyer asked for 30 months, which I believe was not sufficient, at least at this juncture. Certainly not sufficient.

I did vary downward. I don't really want to say that I considered your age that much, because I consider -- you

know, with the ages that we tend to live to these days, while you may have some health issue, I would certainly expect that you would be released with still the opportunity to enjoy, you know, plenty of time while on this earth. So while I did consider that, I didn't think it really warranted a significant downward departure.

I did factor in a couple of things you did. While it was pretty small in the scheme of things, you did tender $50,000. The United States had a valid forfeiture action on your property. They could have forced a sale of it. But it is easier for all involved for you just to pay that small amount to the United States. It was something. It was something that you did tender. Factored that in.

I factored in, you know, the fact that you had a good life, that you've been a good citizen, that you've been a loving family person. I think probably financial circumstances prompted this. Most of the time they do. But I felt that departing downward from 97 months to 78 months is, at least in my mind, a significant departure down. So that's why I sentenced you as I did.

As for the son, for Shane Paul Camus, you know, I have had a number of father/son defendants. And, you know, I don't quite know how to say this, except just to say it. And that is, you know, oftentimes or especially, especially when you're in a loving relationship with your father, it's hard not

to get involved in these things.

I have not been able to peel back the layers sufficiently to know how much under the thumb of your father you were, but I'll just say, my common sense, my life experience tells me that it's hard sometimes for a younger person, especially if they really love and respected their parents, to walk away.

And to the extent that that -- you weren't in any way involved in that or the subject to that, I felt an accommodation should be given. I also factored in, you know, the loss attributed to your father was $4 million, the loss attributed to you, 2 million. You paid 200,000. That's a significant amount, 200 and change, somebody your age, 230,000. Thirty months? No, that was -- that was simply too low. But I felt that the amount that I awarded here, 60 months -- from 97 months to 60 months is a significant reduction, significant. And, you know, your lawyer's asked for way much more than what I would ever feel comfortable giving.

And so I feel that what I've given is very fair and very appropriate and really tremendously -- under the circumstances, pretty merciful, quite frankly.

[redacted]

But, in essence, that's why I sentenced both of you as I did. You had some minor interactions with the criminal justice system, Shane Paul Camus, not very significant, you know, teenage, young-person kinds of things.

So anyway, for both of you, that's why I've sentenced as I did.

The Court has accepted the plea agreement for both of you because it is satisfied that the agreement adequately reflects the seriousness, the actual offense behavior, and that accepting the plea agreement will not undermine statutory purposes of sentencing.

Do I need to dismiss anything? There's no underlying indictment? There's no additional count that I need to dismiss, Mr. Strauss?

**MR. STRAUSS:** No, Your Honor.

**THE COURT:** Okay. Thank you.

I'll talk about the rest of this in a minute. I just want to get through the colloquy. The Court -- I'm sorry, the Court, having pronounced sentence, does counsel for the defendant or government have any objections to the sentence or to the manner in which the Court pronounced sentence, other than those previously stated for the record?

Mr. Strauss.

**MR. STRAUSS:** No, Your Honor.

**THE COURT:** Mr. Merlino.

**MR. MERLINO:** No, Judge.

**THE COURT:** Mr. Entin.

**MR. ENTIN:** No, Your Honor.

**THE COURT:** All right. It's further ordered that each defendant may voluntarily surrender at the institution designated by the Bureau of Prisons on a date no sooner than December 31st, 2024.

Around December 1st, Counsel, Mr. Merlino, Mr. Entin, you will need to file a motion asking me to extend that deadline, which I will happily do. But I just don't want to extend it further than what it needs to be. So you let me know around December 1st. I would be willing, more or less, to extend it, basically, anytime in 2025. I'd just rather do things piece by piece.

**MR. MERLINO:** [redacted]

**THE COURT:** Not anymore. It changed.

**MR. MERLINO:** Oh, really.

**THE COURT:** It changed, yes.

**MR. MERLINO:** I know there were exceptions to it.

**THE COURT:** It used to be you had to do it within a year. That changed a while ago.

Did it not, Mr. Strauss? Are you familiar with that?

**MR. STRAUSS:** Your Honor, I'm familiar with the

one-year deadline is not strictly enforced and often incurred after the one year.

**THE COURT:** No. I think that changed. I'm pretty sure that changed. [redacted]

But I'll tell you what, Mr. Merlino, you need to research that, because it's you and your client.

**MR. MERLINO:** What I gleaned from my recent research Judge, is it can be, with an explanation from DOJ.

**THE COURT:** Let's see.

**MR. MERLINO:** Other than that, the only thing I'd like on the record --

**THE COURT:** Hold on one second. Let me look at this. Because I'm quite certain you are no longer bound by the one year. Hold on a second.

[redacted]

[redacted]

**MR. MERLINO:** That's why I say explanation, where the government would have to explain one of the three facets of that.

**THE COURT:** Well, you get with him, and let there be no doubt, because it's -- you know, you're the person acting for your client.

**MR. MERLINO:** Absolutely.

**THE COURT:** And so you're going to have to make certain that you're comfortable with that, you know, in case it's another sentencing judge, in case I'm no longer here, but, you know, I would expect to be, hopefully.

I think you're covered under 2B. That's what I think. I think you're covered under 2. So I'm telling you right now, I feel comfortable under 2B. But you've got to feel comfortable with it. That's the most important thing. Because if it's another judge, you're going to have to explain to that judge why it's timely. So you need to make certain you've

covered your bases.

**MR. MERLINO:** Thank you, Judge. The only other thing is a recommendation that he be housed --

**THE COURT:** I'm not there yet. I'm not there.

**MR. MERLINO:** I'm sorry.

**THE COURT:** I'm not there. Any -- I think I was with objections or -- any other objections?

Mr. Strauss doesn't have any.

Do you have any -- you don't have any others, Mr. Merlino?

**MR. MERLINO:** No.

**THE COURT:** Mr. Entin.

**MR. ENTIN:** No, Your Honor.

**THE COURT:** Okay. Oh, I did say that about -- that's right. I had gotten past that. Voluntarily surrender at a date no sooner than December 31st, 2024. [redacted]

Okay. The defendants are ordered to immediately proceed to the office of the United States Marshal for processing and further instructions.

To the extent permitted by your plea agreement, you

have a right to appeal from the judgment and sentence within 14 days from the entry of the judgment.

Failure to appeal within the 14-day period shall be a waiver of your right to appeal.

The government may file an appeal from the sentence.

You are also advised that you're entitled to the assistance of counsel in taking an appeal.

And if you are unable to afford a lawyer, one will be provided for you.

If you are unable to afford the filing fee, the clerk of the court will be directed to accept the notice of appeal without such fee.

All right. Now, I'll do recommendations.

Mr. Merlino, where would your client like to be housed?

**MR. MERLINO:** Southern District of Florida, Judge, at the camp in Miami, please.

**THE COURT:** Okay. I make that recommendation. Miami.

How about Mr. Entin, where would your client like to be housed?

**MR. ENTIN:** He would also like to be housed in that same location as well.

**THE COURT:** Okay. There's a federal prison camp in Miami. I normally don't assign to the federal prison camp in

Miami. Normally, they want Eglin. I take it there's a federal prison camp.

**MR. ENTIN:** There is a camp at MCC Miami.

**THE COURT:** Okay. I make the recommendation, then, for the camp.

Are there any other recommendations that you want me to make?

**MR. ENTIN:** No, Your Honor. But I have one request. [redacted] I would ask that you seal the record for some period of time.

**THE COURT:** You know, I am not a big fan of sealing records. I will seal a portion of it. Courts are open proceedings -- I mean, open places where anybody can walk in, and see what's going on, hear what's going on. I don't like to seal records. I think transparency is really important. So I am not going to seal these proceedings.

However, if this -- if this transcript -- if this transcript is ever transcribed -- or this hearing, I ought to say, is ever transcribed, well, I'm willing to consider redacting or -- yeah, redacting part of the record.

[redacted]

**MR. ENTIN:** He has. He has. Yeah. I alluded to that. [redacted]

[redacted] If you could just redact that, it would be --

**THE COURT:** I just don't know what it is. I don't know what those comments are, but I will -- if this hearing is transcribed, I will -- I direct the court reporter to redact those comments [redacted]. It's just that they've been made throughout the hearing. So -- but we'll -- you know, I'll do that. But I'm not sealing the whole record.

**MR. ENTIN:** I understand. Thank you.

**THE COURT:** Is there anything else? No other recommendations? Nothing else? Okay.

**MR. MERLINO:** No, Judge.

**THE COURT:** I think that's it. Okay. Thank you, everybody, and best of luck.

(Proceedings adjourned at 3:34 p.m.)

I, Rebekah M. Lockwood, RDR, CRR, certify that the foregoing is a true and correct copy of the transcript originally filed with the clerk of court on the 6th day of March, 2026, and incorporating redactions requested by the following attorneys of record: The Court, in accordance with Judicial Conference policy, and so ordered by The Honorable Virginia M. Hernandez Covington on the 7th day of March 2024. Redacted characters appear as black boxes in the transcript.

Rebekah Lockwood

REBEKAH M. LOCKWOOD, RDR, CRR
Official Court Reporter
United States District Court
Middle District of Florida

**CERTIFICATE OF REPORTER**

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, Rebekah M. Lockwood, RDR, CRR, do hereby certify that I was authorized to and did stenographically report the foregoing proceedings; and that the foregoing pages constitute a true and complete computer-aided transcription of my original stenographic notes to the best of my knowledge, skill, and ability.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand at Tampa, Hillsborough County, Florida, this 6th day of March 2026.

Rebekah Lockwood

REBEKAH M. LOCKWOOD, RDR, CRR
Official Court Reporter
United States District Court
Middle District of Florida